**BAXA CORPORATION, a Colorado
corporation, Plaintiff,**

**v.**

**McGAW, INC., a Delaware corporation,
Excelsior Medical Corporation, a New
Jersey corporation, Defendants.**

**EXCELSIOR MEDICAL
CORPORATION,
Plaintiff,**

**v.**

**BAXA CORPORATION, a Colorado
corporation, and Brian E.
Baldwin, Defendants.**

Civil Action Nos. 92–B–80, 96–B–1207.

United States District Court,
D. Colorado.

Dec. 11, 1997.

Amended Judgment Filed Jan. 23, 1998.

Brian D. Smith, Fields, Lewis, Rost & Smith, Denver, CO, John R. Mann, Heather F. Shores, Kennedy & Christopher, P.C., Denver, CO, Gregory C. Smith, Fairfield and Woods, P.C., Denver, CO, for Baxa.

Gretchen L. Aultman, Richard W. Daily, Burns, Wall, Smith and Mueller, P.C., Denver, CO, Theodore Arnold Pianko, William J. O'Brien, Christie, PArker & Hale, L.L.P., Pasadena, CA, for McGaw, Inc.

Stanley L. Garnett, Terence S. Gill, Brownstein Hyatt Farber, Denver, CO, for Excelsior Medical Corp.

Eric R. Jonsen, Ciancio, Tasker, Dupree & Jonsen, P.C., Westminster, CO, for Baxa & Brian Baldwin.

## ORDER

BABCOCK, District Judge.

Excelsior Medical Corporation (Excelsior) asserts identical claims in 92–B–80 and counterclaims in 96–13–1207 for antitrust violations and four state-law-based torts. Baxa Corporation (Baxa) moves for summary judgment on all five claims and counterclaims

(hereinafter, "claims"). For the following reasons, I will grant Baxa's motions.

## I.

The following facts are undisputed or, if disputed, are viewed in a light most favorable to Excelsior. In 1992, Baxa initiated an action (92–B–80) for patent infringement against Excelsior and McGaw, Inc. (McGaw). In its Second Amended Answer and Counterclaim, Excelsior asserted counterclaims for: (1) monopolization and attempted monopolization under federal antitrust law; (2) intentional interference with contract; (3) intentional interference with prospective business advantage; (4) fraud; and (5) violation of the Colorado Consumer Protection Act. Thereafter, in 1996, Excelsior filed a separate action in state court alleging precisely the same claims. The state court action was removed to this court (96–B–1207) and consolidated with Baxa's patent infringement action. I will address Excelsior's counterclaims in 92–B–80 and claims in 96–B–1207 in tandem, as they are identical.

Baxa initiated an action against Excelsior and McGaw in January 1992 for infringement of United States Patent No. 5,024,347 (the '347 patent), which issued to Brian Baldwin on June 18, 1991. On December 2, 1993, that case was administratively closed pending the outcome of a reexamination of the '347 patent by the United States Patent and Trademark Office (PTO). On reexamination, Baxa submitted to the PTO several new pieces of prior art identified by Excelsior and McGaw during the early stages of the case. The PTO initially rejected all the original claims of the '347 patent. However, after Baxa amended the claims to include the limitation that the pump operated at a constant pump speed, the PTO allowed all thirty-one claims and reissued the patent on March 20, 1995. Baxa's patent infringement case against Excelsior and McGaw was subsequently reopened on July 3, 1996.

During the fall of 1994 and winter of 1995, while the patent infringement litigation was administratively closed, Excelsior negotiated and entered into a "Promotion Agreement" with Eli Lilly & Company (Lilly). The agreement pertained to the distribution of a syringe pump system manufactured by Excelsior for the intravenous dispensing of antibiotics and other pharmaceuticals. Lilly apparently believed that if target hospitals switched from a frozen delivery system to an Excelsior syringe pump system, Lilly would have a better opportunity to sell injectable antibiotics to those hospitals. The agreement was signed March 1, 1995, and was terminable at the will of either party.

Baxa learned of the promotional agreement between Excelsior and Lilly in the spring of 1995 through sales representatives. On April 25, 1995, Brian D. Smith, Baxa's patent attorney, wrote a letter to Lilly concerning Baxa's lawsuit against Excelsior. The letter stated, inter alia, that "[i]t would appear that Eli Lilly's placement (or encouragement thereof) of Excelsior's PharmAssist Pumps constitutes direct and/or contributory infringement of the 347 patent...." Lilly responded with a letter stating that "[A]s a matter of business judgment, we wish to avoid controversy and assure you that the PharmAssist Pump will not be part of any Lilly sales and marketing program." Lilly thereafter notified Excelsior that it was terminating the promotional agreement.

Per my order of October 14, 1997, I concluded, after detailed construction of the claims at issue, that Excelsior's PharmAssist Pump does not infringe the '347 patent as a matter of law. Because it was raised only as an affirmative defense, I did not decide whether the '347 patent is invalid.

## II.

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The nonmoving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking sum-

mary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *Celotex,* 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.,* 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). The substantive burden of proof that the plaintiff must meet at trial also applies at the summary judgment stage. *Anderson v. Liberty Lobby,* 477 U.S. 242, 244–47, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III.

All of Excelsior's claims arise from its allegations that Baxa: (1) procured the '347 patent by fraud on the United States Patent and Trademark Office; (2) enforced its patent against Excelsior knowing that it is invalid; and (3) threatened to enforce the '347 patent against Lilly knowing that the patent was invalid and not infringed by Excelsior's PharmAssist pump. Because I conclude that Excelsior has failed to produce sufficient evidence to support these allegations, I will grant Baxa's motions for summary judgment on all claims.

#### A. *Antitrust Claim*

■ Excelsior claims that Baxa has monopolized or attempted to monopolize the market for pharmaceutical pumps by misusing the '347 patent in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. That section makes it unlawful for any person to "monopolize or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." Generally, this requires a plaintiff to show: (1) specific intent to monopolize through illegal means; and (2) dangerous probability of monopoly. *See Spectrum Sports v. McQuillan,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

■ Patents, however, are a significant exception to this general rule. "Within the limits of the patentee's rights under his patent, monopoly of the process or product by him is authorized by the patent statutes." *United States v. Line Material Co.,* 333 U.S. 287, 305, 68 S.Ct. 550, 92 L.Ed. 701 (1948). Indeed, "[t]he very object of [the patent] laws is monopoly." *Bement & Sons v. National Harrow Co.,* 186 U.S. 70, 91, 22 S.Ct. 747, 46 L.Ed. 1058 (1902). Therefore, ownership of a valid patent precludes antitrust liability for monopolization of a product or process within the scope of the patent. *See Simpson v. Union Oil Co.,* 377 U.S. 13, 24, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

■ The patent defense protects the patentee from a variety of monopolization claims. For example, where the claimed act of monopolization is that the patentee filed an infringement action, no antitrust violation is established where the patentee had the right to file the infringement action to protect his patent. *See Cole v. Hughes Tool Co.,* 215 F.2d 924, 935 (10th Cir.1954). Similarly, where a patent is valid, the patentee has the right to give notice to infringers and their customers of the patent and to threaten litigation for infringement without violating the antitrust laws. *See Brown v. Myerberg,* 314 F.Supp. 939, 943 (S.D.N.Y.1970). Nevertheless, the patent defense is not absolute.

■ In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Court concluded that the enforcement of a patent procured by fraud on the PTO may be violative of § 2 of the Sherman Act, provided the other elements necessary to establish a Sherman Act violation are proved. Justice Harlan's concurrence provides a succinct summary of the Court's discussion:

> [A] treble-damage action for monopolization which, but for the existence of a patent, would be violative of § 2 of the Sherman Act may be maintained . . . if two conditions are satisfied: (1) the relevant patent is shown to have been procured by knowing and willful fraud practiced by the defendant on the Patent Office or, if the defendant was not the original patent ap-

plicant, he had been enforcing the patent with knowledge of the fraudulent manner in which it was obtained; and (2) all elements otherwise necessary to establish a § 2 monopolization charge are proved. Conversely, such a private cause of action would not be made out if the plaintiff: (1) showed no more than invalidity of the patent arising, for example, from a judicial finding of "obviousness," or from other factors sometimes compendiously referred to as "technical fraud"; or (2) showed fraudulent procurement, but no knowledge thereof by the defendant; or (3) failed to prove the elements of a § 2 charge even though he has established actual fraud in the procurement of the patent and the defendant's knowledge of that fraud.

The contours of the *Walker Process* doctrine have been shaped by the individual circuits, and the Federal Circuit defers to the law of the circuit in which the district court sits to interpret its parameters. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 875 (Fed.Cir.1985). The Tenth Circuit has not interpreted the *Walker Process* doctrine in a published opinion. However, the parties are not in significant disagreement as to its scope, and I am guided by the general principles articulated by other circuits.

■ The fraud that must be proved to support an antitrust claim under *Walker Process* is "extremely circumscribed." *See Cataphote Corp. v. DeSoto Chemical Coatings, Inc.,* 450 F.2d 769, 772 (9th Cir.1971), *cert. denied,* 408 U.S. 929, 92 S.Ct. 2497, 33 L.Ed.2d 341 (1972). There must be a showing of deliberate fraud:

> Wholly inadvertent errors or honest mistakes which are caused by neither fraudulent intent or design, nor by the patentee's gross negligence, do not constitute fraud under *Walker....* The road to the Patent Office is so tortuous and patent litigation is usually so complex, that "knowing and willful fraud" as the term is used in *Walker* can mean no less than clear, convincing proof of intentional fraud involving affirmative dishonesty, a deliberately planned

and carefully executed scheme to defraud ... the Patent Office.

*Id.* (citations and quotations omitted).

■ A mere showing of "inequitable conduct" that is otherwise sufficient to invalidate a patent does not necessarily rise to the level of the knowing and willful fraud required to establish a violation of the Sherman Act. *Argus, supra* at 1384–85. Further, to support an antitrust claim, the fraud on the patent office must have been material; that is, the plaintiff must show that but for the fraud, the patent would not have issued. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1364 (Fed.Cir. 1984). In sum, to establish an antitrust violation based on conduct before the patent office, the plaintiff must show by clear and convincing evidence (1) deliberately fraudulent conduct before the PTO that (2) materially affected the allowance of the patent and (3) all of the other requirements of § 2 of the Sherman Act.

■ The *Walker Process* doctrine has been extended to include where the patentee brings or continues an infringement suit with knowledge that the patent is invalid. If such conduct otherwise meets the requirements of § 2 of the Sherman Act, it is not immune from antitrust liability. *See Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 993 (9th Cir. 1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). To prevail, however, an antitrust plaintiff "must establish that the patentee acted in bad faith in enforcing the patent because he knew that the patent was invalid." *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.,* 812 F.2d 1381, 1386 (Fed.Cir.1987). A patent is presumed valid, and "a patentee's infringement suit is presumptively in good faith[;] ... this presumption can be rebutted only by clear and convincing evidence." *Handgards, supra* at 996. Similarly, threatening suit for infringement may violate the Sherman Act where the patentee acts with knowledge that his patent is invalid. *See Chromium Indus., Inc. v. Mirror Polishing & Plating Co.,* 448 F.Supp. 544, 558 (N.D.Ill.1978).

■ Excelsior alleges that Baxa violated antitrust laws by both intentionally defraud-

ing the PTO and by enforcing or threatening to enforce a patent it knew was invalid. I conclude, however, that Excelsior has failed to provide sufficient evidence that a reasonable juror could find by clear and convincing evidence that Baxa either: (1) intentionally defrauded the PTO so as to make a material difference in the outcome of the patent prosecution; or (2) acted in bad faith with knowledge of the invalidity of the '347 patent in asserting claims for infringement or contacting Lilly. Accordingly, I will grant Baxa's motion for summary judgment on this claim.

Excelsior relies specifically on six bases to support its antitrust claim: (1) failure to disclose prior art during prosecution; (2) misrepresentation of prior art during reexamination; (3) failure to disclose the best mode of the invention; (4) misrepresentation of inventorship; (5) failure to disclose a prior sale of a product embodying the invention; and (6) enforcement of a patent it knew was invalid. The evidence submitted to support these bases, however, is insufficient to survive summary judgment.

### 1. *Failure to Disclose Prior Art During Prosecution*

Excelsior contends that Baxa intentionally failed to disclose to the PTO seven examples of material prior art. Specifically, Excelsior points to the following other pumps as prior art Baxa should have disclosed to the PTO: (1) the ADS 100 pump; (2) the Acacia pump; (3) the Wheaton Omnispense pump; (4) the Wheaton Unispense II pump; (5) the "Solopak" DDP–1000 pump; (6) the Bard pump; and (7) the Becton–Dickinson (BD) pump. I conclude, however, that with regard to each example of prior art, Baxa's omission either was not intentionally fraudulent or was immaterial within the scope of the *Walker Process* doctrine.

#### a. The ADS 100 pump

Baxa, through Baldwin, did not disclose the ADS 100 pump to the PTO at the time of the original patent application in 1988; however, the ADS 100 was considered by the PTO during the reexamination in 1993. Excelsior's Exh. A. The PTO allowed the claims in spite of the ADS 100, which is strong evidence that Baxa's failure to disclose the

ADS 100 with the original application was immaterial. As the Federal Circuit has explained:

> When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty is to issue only valid patents.

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed.Cir. 1984).

Excelsior has failed to present evidence sufficient to overcome that deference to the PTO and create a genuine issue of fact whether the ADS 100 was material prior art. The ADS 100 Operating and Service Manual (Excelsior Exh. L) discloses that the ADS 100 is calibrated on a trial-and-error basis. *Id.* at 4–14, 4–15. As I concluded in my October 14, 1997, order, the independent claims of the '347 patent require calibration based on an assumed calibration factor. The ADS 100 does not embody that teaching. This significant distinction coupled with the examiner's consideration of the ADS–100 on reexamination lead to the inexorable conclusion that Baxa's failure to disclose the ADS–100 during the original application process is immaterial under the *Walker Process* doctrine.

#### b. The Acacia and Wheaton Pumps

Excelsior asserts that the Acacia and Wheaton pumps were material prior art and not disclosed by Baxa. As evidence of Baxa's knowledge of these pumps, Excelsior points to Baldwin's disclosure of them in a prior patent application (U.S.Pat. No. 4,976,590). In addition, Excelsior presents the affidavits of Margaret Lumia and Ron Lawton as to the operation of these pumps.

Baxa argues that the Acacia and Wheaton pumps were not material to the '347 patent because they do not embody all of the elements of any independent claim in the '347

patent. In particular, Baxa contends that these pumps were immaterial because they required manual calculations in "step 3" of the calibration process. However, in my October 14, 1997, order, I concluded that, with the exception of claim 19, the independent claims of the patent are not limited to automatic calculation. October 14, 1997, order, pp. 21–23.

Nevertheless, even assuming that the Acacia and Wheaton pumps were material prior art, I conclude that antitrust liability cannot attach. As discussed, antitrust liability under *Walker Process* requires an intentional misrepresentation to the PTO. Baxa has consistently maintained throughout this litigation that the '347 patent is limited to automatic, as opposed to manual, calibration. There is no evidence that Baxa did not hold that belief throughout the prosecution of the '347 patent. That I construed the claims more broadly does not provide clear and convincing evidence that Baxa intentionally deceived the PTO regarding prior art. Although I deemed its arguments unpersuasive, the issue whether automation is implicit in the independent claims of the '347 patent was a close one, and Excelsior has presented no evidence to permit a reasonable juror to find the level of scienter necessary to support antitrust liability.

### c. The "Solopak" DDP–1000 Pump

Similar to the ADS–100, the DDP–1000 requires manual calibration by a trial-and-error method. Excelsior Exh. K pp. 16–17. Therefore, as with the ADS–100, Baxa's failure to disclose the DDP–1000 to the PTO is immaterial. Nor is it apposite that, unlike the ADS–100, Baxa did not disclose the DDP–1000 during reexamination. "When a reference is cumulative to other prior art that was before the examiner, the element of materiality is not established...." *Engel Ind., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1534 (Fed.Cir.1991). As Excelsior admits, the DDP–1000 and ADS 100 are almost identical in operation. *See* Excelsior Br. on Obv. & Antic., p. 27, n. 20. Therefore, Baxa's failure to disclose the DDP–1000 to the PTO cannot support Excelsior's antitrust claim.

### d. The Bard and BD Pumps

Excelsior presents no evidence of the operation or materiality of the Bard and BD pumps. Instead, it states conclusorily that these two pumps embodied the elements of the '347 patent and should have been disclosed. Attorney argument, however, is insufficient to survive summary judgment, and antitrust liability is not supported by Baxa's failure to disclose these two pumps. *See Otteson, supra* at 519.

### 2. *Misrepresentation of Prior Art During Reexamination*

Excelsior next argues that Baxa made intentional, material misrepresentations about prior art during the reexamination of the '347 patent. In particular, Excelsior argues that Baxa violated antitrust laws by intentionally misrepresenting the operation of the Masterflex Computerized Drive (Masterflex) pump, manufactured by Cole–Palmer. I disagree. In context, Baxa's statements to the PTO regarding the Masterflex pump were mere advocacy and not actionable.

The Masterflex pump operates in two distinct modes. In the "stand-alone" mode, the pump operates with no connection to an external computer, and it functions exactly like the "Digi–Staltic" pumps that preceded it. *See* Keats' First Expert Rep., p. 8. The Digi–Staltic pumps embody the Wolff patent that was extensively discussed in my October 14, 1997, order. Supp. Eilers Aff., pp. 6–7. The examiner cited the Wolff patent and it was central during the original prosecution. Excelsior presents evidence that the Masterflex pump operates at a constant pump speed during calibration in the stand-alone mode.

By contrast, the Masterflex pump's second mode of operation incorporates a control system through an external personal computer (PC). During the reexamination proceeding, Baxa provided the deposition testimony of Robert Rymarczyk, a Cole–Palmer employee, regarding this operation of the second mode of the Masterflex pump. The examiner, cited to the Rymarczyk deposition testimony and exhibits 159 and 160 thereto in first rejecting all of the claims of the '347 patent during reexamination. Office Action in Reexam., p. 2. Exhibits 159 and 160 are

excerpts from the PC software supplied with the Masterflex pump. Supp. Eilers Aff., p. 7. Therefore, it is apparent that the term "Masterflex Computerized Drive" as used in Baxa's reexamination disclosures and the examiner's office action on reexamination referred to the operation of the Masterflex pump in the second mode.

Baxa argued during reexamination that the claims of the '347 patent were patentable over the second mode of the Masterflex pump because they required calibration at a constant speed, and the second mode of the Masterflex pump requires changing pump speeds before and after calibration. Specifically, Baxa stated to the PTO:

> The procedures for calibrating the Masterflex Computerized Drive are described on pages 7–7 through 7–11 of the software operator's manual for the Masterflex Computerized Drive .... the Requestor admits that at first glance this entered volume calibration method appears to be very similar to that disclosed and claimed in the '347 patent. However, as indicated in the second paragraph on page 7–7 of the operator's manual, this method is merely one of four calibration methods available, i.e. standard, table, flow, volume and weight for calibrating a selected flow rate for the pump. (See page 7–8, item number 6, where it is clear that it is a selected flow rate which is being calibrated[) ]. As previously described with respect to the Shirkan disclosures, if a selected flow rate is being calibrated, it is necessary to adjust the pump's rotor speed. The Masterflex Computerized Drive is no different. (See page 654 of the Cole–Palmer catalogue which confirms that a selected flow rate for the Masterflex Computerized Drive is controlled and therefore calibrated by adjusting pump speed[) ].
> In complete contrast, the pump disclosed and claimed in the '347 patent is not calibrated by calibrating the pump's flow rate, nor is any adjustment made to the pump's speed.

Excelsior contends that Baxa's statement that "if a selected flow rate is being calibrated, it is necessary to adjust the pump's rotor speed" is false and materially misleading because the stand-alone mode of the Masterflex pump does not require a change in pump speed. I disagree. As discussed, the context of the exchange between Baxa and the examiner makes it clear that Baxa was referring to the second mode of the Masterflex pump. Baxa's arguments for distinguishing the stand-alone mode of the Masterflex pump (embodying the Wolff patent) rested on other grounds. See Order of Oct. 14, 1997. Accordingly, I conclude that no reasonable juror could find by clear and convincing evidence that Baxa deliberately and affirmatively misrepresented the operation of the Masterflex pump to the PTO.

### 3. Failure to Disclose Best Mode

Excelsior next argues that Baxa failed to disclose the best mode of the invention embodying the '347 patent as required by 35 U.S.C. § 112. Specifically, Excelsior contends that Baxa failed to disclose a particular kind of sequential calibration technique for fine-tuning calibration of the pump subsequent to initial calibration. I am not persuaded. As the Federal Circuit has stated:

> The best mode inquiry is directed to what the applicant regards as the invention, which in turn is measured by the claims. Unclaimed subject matter is not subject to the disclosure requirement of § 112; the reasons are pragmatic: the disclosure would be boundless, and the pitfalls endless.

Engel Indus., Inc. v. Lockformer Co., 946 F.2d 1528, 1531 (Fed.Cir.1991). The sequential calibration technique described by Excelsior is not claimed in the '347 patent. Accordingly, Excelsior's argument is without merit.

### 4. Misrepresentation of Inventorship

Excelsior contends that Brian Baldwin, the sole named inventor on the '347 patent, is not the inventor at all, thus invalidating the patent under 35 U.S.C. § 102(f). Again, however, the "presumption of the validity of a patent includes a presumption that the original inventor is named." Maxwell v. K Mart Corp., 880 F.Supp. 1323, 1331 (D.Minn.1995). That presumption must be overcome by clear and convincing evidence. Petersen v. Fee

*Intern., Inc.,* 381 F.Supp. 1071, 1079 (W.D.Okl.1974). The two documents offered by Excelsior in support of its argument fall well short of the level at which any reasonable juror could find misrepresentation of inventorship by clear and convincing evidence.

The first document is a licensing and supply agreement between two Swiss companies, Schoch Electronics AG and Hypomed AG. Baxa is not a party to the agreement. The agreement states that Schoch "has developed and presently owns all rights on a special pharmacy called 'Exacta–Med Pharmacy Pump' ... (including all technical and research documents, all drawings, diagrams, charts, development information, etc.)." Excelsior offers no evidence, however, that the Exacta–Med Pharmacy Pump embodies the claims of the '347 patent, and the agreement is, therefore, irrelevant.

The second document is an unsigned letter of March 28, 1988, soliciting input concerning inventorship and development of "the mechanical design, software and electronic/microprocessor circuit design" for unidentified "pump and tube sets." There is no evidence that this letter pertains to the '347 patent. Indeed, it may pertain to Baldwin's application for U.S. Patent No. 4,976,590, which was filed on June 8, 1988, and pertains to a pump and tube set. Excels. Exh. N. This evidence is insufficient for a reasonable juror to find by clear and convincing evidence that Baldwin is not the true and sole inventor of the '347 patent.

### 5. *Prior Sale under 35 U.S.C. § 102(b)*

██ A patent is invalid if the invention was on sale in the United States more than one year prior to the date of the patent application. 35 U.S.C. §§ 102(b), 100(c). The alleged invalidating prior sale must be proved by clear and convincing evidence. *Baker Oil Tools, Inc. v. Geo Vann, Inc.,* 828 F.2d 1558, 1563 (Fed.Cir.1987). Again, Excelsior's evidence falls short of this standard.

██ Excelsior submits only Exhibit G1 in support of its argument. That document appears to be a draft of a proposed agreement between Baxa, Schoch Electronics

AG, and Hypomed AG for the licensing and transfer of rights to an unidentified Baxa pump. Nothing in the document links the proposed agreement to the '347 patent. In addition, the proposed agreement appears to contemplate sales of the unidentified pump in Switzerland. For a prior sale to be invalidating under § 102(b), it must occur in the United States. *Gandy v. Main Belting Co.,* 143 U.S. 587, 592–93, 12 S.Ct. 598, 36 L.Ed. 272 (1892). Further, by its terms, the document is a "proposed agreement," not a final sale. "It is not a violation of the on-sale bar to make preparations for the sale of a claimed invention—an actual sale or offer to sell must be proved." *Intel Corp. v. U.S. Int'l Trade Comm.,* 946 F.2d 821, 830 (Fed. Cir.1991). No reasonable juror could find for Excelsior based on this evidence.

### 6. *Enforcement of Patent Known to be Invalid*

Excelsior's final argument for antitrust liability is that Baxa continued to enforce its '347 patent and threaten Lilly with litigation even after Baxa knew the '347 patent to be invalid. This argument depends again on a finding by clear and convincing evidence that Baxa knew the '347 patent was invalid. Excelsior advances no new arguments to support such a finding, and for the reasons stated above, I conclude that no reasonable juror could find for Excelsior based on the evidence presented.

Because Excelsior has failed to present sufficient evidence to prove fraud or bad faith by Baxa in the enforcement or threatened enforcement of the '347 patent, I need not address the other elements necessary to show a § 2 violation of the Sherman Act. Accordingly, I will grant Baxa's motion for summary judgment on Excelsior's antitrust claim.

### B. *State–Law Tort Claims*

██ Excelsior asserts the following state-law claims: (1) intentional interference with contract; (2) intentional interference with prospective business advantage; (3) fraud; and (4) violation of the Colorado Consumer Protection Act. All of these claims are based on Baxa's letter to Lilly that resulted

in the termination of the promotional agreement between Excelsior and Lilly. Excelsior concedes that under federal law, a patentee who gives notice to an alleged infringer's customers or business associates of their own potential liability for infringement is not liable for damages unless the notice is given in bad faith. *See Accent Designs, Inc. v. Jan Jewelry Designs, Inc.*, 827 F.Supp. 957, 964 (S.D.N.Y.1993); Excels. Br. at 9–10. Therefore, in addition to the traditional claim elements, Excelsior must prove for each claim that Baxa threatened Lilly with enforcement of a patent it knew was either (a) invalid, (b) procured by fraud on the PTO, or (c) not infringed. Because no reasonable juror could make such a finding based on the evidence presented, I will grant Baxa's motion for summary judgment on all of Excelsior's state law claims.

A patent is presumed valid. 35 U.S.C. § 285. Therefore, to the extent Excelsior relies on invalidity or fraud on the PTO to support its claims, as with Excelsior's antitrust claim, it must prove invalidity or fraud and Baxa's knowledge thereof by clear and convincing evidence. *See Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990). As I have already concluded that no reasonable juror could find by clear and convincing evidence that Baxa intentionally enforced a patent that was invalid or procured by fraud, these bases for Excelsior's state-law claims are unavailing. The only remaining basis for Excelsior's state-law claims is that Baxa intentionally threatened Lilly with a patent it knew not to be infringed. Again, I am unpersuaded.

Although I granted Excelsior's motion for summary judgment on Baxa's infringement claims, I did so only after a detailed interpretation of the claims. That the interpretation of claims is now a legal matter exclusively within the court's purview, *see Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), does not make the process of arriving at a claim construction any more predictable to the litigants. Although I eventually deemed Baxa's arguments regarding claim construction unpersuasive, those arguments clearly were not frivolous. As evidenced by the length and complexity of my October 14, 1997, order, Baxa presented a good faith argument for an interpretation of the claims that could have resulted in a finding of infringement by Excelsior. Therefore, no reasonable juror could find that Baxa intentionally threatened Lilly with a patent it knew not to be infringed, and I will grant Baxa's motion for summary judgment on all of Excelsior's state-law claims.

Accordingly, it is ORDERED that:

1. Baxa's motion for summary judgment on Excelsior's claim in 96–B–1207 and its counterclaim in 92–B–80 for antitrust violations is GRANTED;

2. Baxa's motion for summary judgment on Excelsior's claims in 96–B–1207 and its counterclaims in 92–B–80 for (1) intentional interference with contract; (2) intentional interference with prospective business advantage; (3) fraud; and (4) violation of the Colorado Consumer Protection Act is GRANTED;

3. All of Excelsior's claims in 96–B–1207 and its counterclaims in 92–B–80 are DISMISSED with prejudice;

4. Baxa is awarded its costs with regard to Excelsior's claims and counterclaims;

It is FURTHER ORDERED that:

5. Baxa's motion for judgment of voluntary dismissal of Excelsior's counterclaims in 92–B–80 is DENIED AS MOOT.

## AMENDED JUDGMENT

PURSUANT TO and in accordance with the Memorandum Opinion and Order filed October 14, 1997, and the Orders filed October 14, 1997, November 7, 1997, December 11, 1997, and January 22, 1998, all by the Honorable Lewis T. Babcock, United States District Judge, it is

ORDERED THAT:

1. Judgment is entered in favor of the defendants, McGaw, Inc. and Excelsior Medical Corporation, and against the plaintiff, Baxa Corporation, on Baxa's claims for patent infringement and inducement to infringe, and those claims are DISMISSED WITH PREJUDICE.

2. McGaw's and Excelsior's motions for summary judgment on their affirmative defenses of invalidity due to obviousness and anticipation, Baxa's motion for partial summary judgment striking defendants' affirmative defenses of invalidity; Defendant Excelsior's motion to supplement its motion for summary judgment of invalidity, Defendant McGaw's motion for summary judgment on its affirmative defense under 35 U.S.C. § 252, Defendant Excelsior's motion for summary judgment on its affirmative defenses of intervening rights and inequitable conduct, and Baxa's motion to strike Excelsior's defense of inequitable conduct are DENIED AS MOOT.

3. Judgment is entered in favor of the defendants, McGaw, Inc. and Excelsior Medical Corporation, and against the plaintiff, Baxa Corporation, on Baxa's claim for contributory infringement, and that claim is DISMISSED WITH PREJUDICE.

4. Judgment is entered in favor of Baxa Corporation and Brian Baldwin, and against Excelsior Medical Corporation on Excelsior's claim in 96–B–1207 and its counterclaim in 92–B–80 for antitrust violations, and those claims are DISMISSED WITH PREJUDICE.

5. Judgment is entered in favor of Baxa Corporation and Brian Baldwin, and against Excelsior Medical Corporation on Excelsior's claims in 96–B–1207 and its counterclaims in 92–B–80 for (1) intentional interference with contract; (2) intentional interference with prospective business advantage; (3) fraud; and (4) violation of the Colorado Consumer Protection Act, and those claims are DISMISSED WITH PREJUDICE.

6. All of Excelsior's claims in 96–13–1207 and its counterclaims in 92–B–80 are DISMISSED WITH PREJUDICE.

7. Baxa's motion for judgment of voluntary dismissal of Excelsior's counterclaims in 92–B–80 is DENIED AS MOOT.

8. Baxa is awarded its costs with regard to Excelsior's claims and counterclaims.

9. McGaw, Inc. and Excelsior Medical Corporation are awarded their costs with regard to Baxa's claims for patent infringement, inducement to infringe, and contributory infringement.